

**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

*Filed in*
*Open court*
*9/26/06*
*(MRG)*

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

September 18, 2006

Murray P. Reiser, Esq.
James McCall, Esq.
4 Longfellow Place
Boston, MA 02114

    Re: United States v. Igor Moyseyev, Criminal No. 05-10010-NMG

Gentlemen:

    This letter sets forth the Agreement between the United States Attorney for the District of Massachusetts ("the U.S. Attorney") and your client, Igor Moyseyev ("Defendant"), in the above-captioned case. The Agreement is as follows:

    1.    Change of Plea

    At the earliest practicable date, but in no event later than September 21, 2006, Defendant shall plead guilty to Counts 42 and 44 of the above-captioned Indictment, which charge, respectively, conspiracy to commit mail, wire and health insurance fraud, in violation of 18 U.S.C. § 371, and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i). Defendant expressly and unequivocally admits that he in fact knowingly and intentionally committed the crimes charged in Counts 42 and 44 of the Indictment and is in fact guilty of those offenses.

    2.    Penalties

    Defendant faces the following maximum penalties: on Count 42, a 5-year term of imprisonment, a $250,000 fine, a 3-year term of supervised release, and a $100 special assessment; on Count 44, a 20-year term of imprisonment, a fine of $500,000 or twice the value of the property involved in the transaction, whichever is greater; a 3-year term of supervised release, and a $100 special assessment.

3.  Sentencing Guidelines

The parties agree to jointly take the following positions at sentencing under the United States Sentencing guidelines: *Defendant should be sentenced using the 2005 version of the guidelines*

(a) The parties agree to take the position that the base offense level on Count 42 (conspiracy) is six (6) pursuant to USSG §2B1.1. *[—2X1.1]* Because Defendant admits, and the U.S. Attorney agrees, that Defendant is responsible for a total loss of more than $70,000, the parties agree to take the position that an eight (8) level increase applies pursuant to USSG §2B1.1. *[2B1.1(b)(1)(e)]* The Defendant admits, and the U.S. Attorney agrees, that the offense involved 10 or more victims, resulting in a two (2) level increase applies pursuant to USSG §2B1.1. *[2B1.1(b)(2)(A)]* The result is an adjusted offense level of 16.

(b) The parties agree to take the position that the base offense level on Count 44 (money laundering) is sixteen (16) pursuant to USSG §2S1.1(a)(1), and that two (2) levels are added pursuant to USSG §2S1.1(b)(2)(B). The result is an adjusted offense level of 18.

(c) The parties agree to take the position that the combined offense level for the offenses charged in Counts 42 and 44 is 18 pursuant to USSG §3D1.2.(c) and USSG § 2S1.1, comment. (n.6).

(d) Based on Defendant's prompt acceptance of personal responsibility for the offense of conviction in this case, and information known to the U.S. Attorney at this time, the U.S. Attorney agrees to recommend that the Court reduce by three (3) levels Defendant's Adjusted Offense Level under USSG §3E1.1. The result is a total offense level of fifteen (15).

The U.S. Attorney specifically may, at his sole option, be released from his commitments under this Agreement, including, but not limited to, his agreement that paragraph 4 constitutes the appropriate disposition of this case, if at any time between his execution of this Agreement and sentencing, Defendant:

(i) fails to admit a complete factual basis for the plea;

(ii) fails to truthfully admit his conduct in the offenses of conviction;

(iii) falsely denies, or frivolously contests, relevant conduct for which Defendant is accountable under USSG § 1B1.3;

(iv) fails to provide truthful information about his financial status;

(v) gives false or misleading testimony in any proceeding relating to the criminal conduct charged in this case and any relevant conduct for which

2

                Defendant is accountable under USSG § 1B1.3;

    (vi)    engages in acts which form a basis for finding that Defendant has obstructed or impeded the administration of justice under USSG §3C1.1;

    (vii)    intentionally fails to appear in Court or violates any condition of release;

    (viii)    commits a crime;

    (ix)    fails to provide truthful information about his financial status; and/or

    (x)    attempts to withdraw his guilty plea.

Defendant expressly understands that he may not withdraw his plea of guilty unless the Court rejects this Agreement under Fed. R. Crim. P. 11(c)(5).

4. Agreed Disposition

The U.S. Attorney and Defendant agree pursuant to Fed. R. Crim. P. 11(c)(1)(C) that the following is the appropriate disposition of this case:

    (a)    an eighteen (18) month term of imprisonment;

    (b)    a $4,000 fine;

    (c)    restitution;

    (d)    a mandatory special assessment of $200; and

    (e)    supervised release for a term of three years.

Defendant expressly understands that he may not withdraw his plea of guilty unless the Court rejects this Agreement under Fed. R. Crim. P. 11(c)(5).

5.    Payment of Mandatory Special Assessment

Defendant agrees to pay the mandatory special assessment to the Clerk of the Court on or before the date of sentencing, unless Defendant establishes to the satisfaction of the Court that Defendant is financially unable to do so.

6.    Protection of Assets for Payment of Restitution and Fine

Defendant agrees not to transfer, or authorize the transfer of any other asset in which he has an interest without prior express written consent of the U.S. Attorney, except for:

   (1)   Assets subject to superior, secured interests of innocent third parties, in which Defendant has an equity interest of less than $5,000

   (2)   Ordinary living expenses necessary to house, clothe, transport and feed Defendant and those to whom he owes a legal duty of support, so long as such assets do not exceed $10,000 per month; and

   (3)   Attorney's fees incurred in connection with this criminal case.

This prohibition shall be effective as of the date of Defendant's execution of this Agreement and continue until the fine and/or restitution ordered by the Court at sentencing incurred as a result of the conduct charged in the Indictment is/are satisfied in full.

Defendant further agrees that, prior to sentencing, he will truthfully and accurately complete the sworn financial statement enclosed with this Agreement.

7.   Waiver of Rights to Appeal and to Bring Collateral Challenge

Defendant is aware that he has the right to challenge his sentence and guilty plea on direct appeal. Defendant is also aware that he may, in some circumstances, be able to argue that his plea should be set aside, or his sentence set aside or reduced, in a collateral challenge (such as pursuant to a motion under 28 U.S.C. § 2255).

In consideration of the concessions made by the U.S. Attorney in this Agreement, Defendant knowingly and voluntarily waives his right to appeal or collaterally challenge:

   (1)   Defendant's guilty plea and any other aspect of Defendant's conviction, including, but not limited to, any rulings on pretrial suppression motions or any other pretrial dispositions of motions and issues; and

   (2)   The imposition by the District Court of a sentence which does not exceed that being recommended by the U.S. Attorney pursuant to this agreement.

Defendant's waiver of rights to appeal and to bring collateral challenges shall not apply to appeals or challenges based on new legal principles in First Circuit or Supreme Court cases decided after the date of this Agreement which are held by the First Circuit or Supreme Court to have retroactive effect.

This Agreement does not affect the rights or obligations of the United States as set forth in 18 U.S.C. § 3742(b), and the U.S. Attorney therefore retains his appeal rights.

8.   Waiver of Hyde Amendment Claim

Defendant is aware that 111 Stat. 2440, 2520 (1997), the so-called "Hyde Amendment," authorizes courts in criminal cases to award to certain prevailing defendants attorneys' fees and

other litigation expenses. In exchange for concessions made by the U.S. Attorney in this Agreement, Defendant voluntarily and knowingly waives any claim that he might assert under this statute based in whole or in part on the U.S. Attorney's agreement in paragraph 1 to dismiss Defendant from counts 1-33 and 35-42.

9. Probation Department Not Bound By Agreement

The sentencing disposition agreed upon by the parties and their respective calculations under the Sentencing Guidelines are not binding upon the United States Probation Office. Defendant's plea will be tendered pursuant to Fed. R. Crim. P. 11(c)(1)(C). Defendant cannot withdraw his plea of guilty unless the sentencing judge rejects this Agreement. If the sentencing judge rejects this Agreement, this Agreement shall be null and void at the option of either the United States or Defendant. In this regard, Defendant hereby waives any defense to any charges which he might otherwise have under any statute of limitations or the Speedy Trial Act.

10. Information For Presentence Report

Defendant agrees to provide all information requested by the U.S. Probation Office concerning his assets.

11. Civil Liability

By entering into this Agreement, the U.S. Attorney does not compromise any civil liability, including but not limited to any tax liability, which Defendant may have incurred or may incur as a result of his conduct and his plea of guilty to the charges specified in paragraph one of this Agreement.

12. Withdrawal of Plea by Defendant

Should Defendant's guilty plea not be accepted by the Court for whatever reason, or later be withdrawn on motion of Defendant, this Agreement shall be null and void at the option of the U.S. Attorney.

13. Breach of Agreement

If the U.S. Attorney determines that Defendant has failed to comply with any provision of this Agreement, has violated any condition of his pretrial release, or has committed any crime following his execution of this Agreement, the U.S. Attorney may, at his sole option, be released from his commitments under this Agreement in their entirety by notifying Defendant, through counsel or otherwise, in writing. The U.S. Attorney may also pursue all remedies available to him under the law, irrespective of whether he elects to be released from his commitments under this Agreement. Further, the U.S. Attorney may pursue any and all charges which have been, or are to be, dismissed pursuant to this Agreement. Defendant recognizes that no such breach by

him of an obligation under this Agreement shall give rise to grounds for withdrawal of his guilty plea. Defendant understands that, should he breach any provision of this agreement, the U.S. Attorney will have the right to use against Defendant before any grand jury, at any trial or hearing, or for sentencing purposes, any statements which may be made by him, and any information, materials, documents or objects which may be provided by him to the government subsequent to this Agreement, without any limitation. In this regard, Defendant hereby waives any defense to any charges which he might otherwise have under any statute of limitations or the Speedy Trial Act.

14. Who Is Bound By Agreement

This Agreement is limited to the U.S. Attorney for the District of Massachusetts, and cannot and does not bind the Attorney General of the United States or any other federal, state or local prosecutive authorities.

15. Complete Agreement

This letter contains the complete and only agreement between the parties. No promises, representations or agreements have been made other than those set forth in this letter. This Agreement supersedes prior understandings, if any, of the parties, whether written or oral. This Agreement can be modified or supplemented only in a written memorandum signed by the parties or on the record in court.

If this letter accurately reflects the Agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Agreement below. Please also sign below as Witness. Return the original of this letter to Assistant U.S. Attorney William Weinreb.

Very truly yours,

MICHAEL J. SULLIVAN
United States Attorney

By: *Laura J. Kaplan /dd*
LAURA J. KAPLAN, Chief
Violent & Organized Crime Section

---

WILLIAM WEINREB
GREGG SHAPIRO
Assistant U.S. Attorneys

6

ACKNOWLEDGMENT OF PLEA AGREEMENT

I have read this letter in its entirety and discussed it with my attorney. I hereby acknowledge that it fully sets forth my agreement with the United States Attorney's Office for the District of Massachusetts. I further state that no additional promises or representations have been made to me by any official of the United States in connection with this matter. I understand the crime to which I have agreed to plead guilty, the maximum penalties for that offense and Sentencing Guideline penalties potentially applicable to it. I am satisfied with the legal representation provided to me by my attorney. We have had sufficient time to meet and discuss my case. We have discussed the charges against me, possible defenses I might have, the terms of this Plea Agreement and whether I should go to trial. I am entering into this Agreement freely, voluntarily, and knowingly because I am guilty of the offense to which I am pleading guilty and I believe this Agreement is in my best interest.

IGOR MOYSEYEV
Defendant
Date: 09/26/2006

I certify that Igor Moyseyev has read this Agreement and that we have discussed its meaning. I believe he understands the Agreement and is entering into the Agreement freely, voluntarily and knowingly.

MURRAY P. REISER, ESQ.
Attorney for Defendant
Date: 9/26/06

7

*EXHIBIT "A"*
*TO PLEA AGREEMENT*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) *Filed in Open Court 9/26/06* |
| v. | ) Criminal No. 05-10010-NMG |
| IGOR MOYSEYEV | ) |

*EXHIBIT A  CR05-10010-NM  TO PLEA AGREEMENT*

### AGREED STATEMENT OF FACTS

The United States of America, by and through its undersigned counsel, and defendant Igor Moyseyev, by and through his counsel, respectfully submit the following agreed statement of facts in connection with Moyseyev's change of plea. Except as noted below, Moyseyev acknowledges that the following (as it pertains to him) is a true, accurate, and complete account of his conduct in connection with the crimes charged in the Indictment.

A.  The Chelsea Clinic

In December 1998, Igor Moyseyev and Severin Yelaun opened a clinic in Chelsea called Broadway Physical Therapy and Rehabilitation (the "Chelsea clinic"). Over 90% of the clinic's patients were automobile accident victims who complained of various types of pain. The patients typically received treatment, medical tests, and/or durable medical goods, and their automobile insurers were billed for the cost.

Igor Moyseyev owned the clinic and worked there nearly every day; he had ultimate authority and responsibility for billing, collection, spending, and personnel matters. Yelaun managed the clinic and worked there most days; he recruited doctors to work

at the clinic, scheduled their time, and supervised the clerical workers, including the workers responsible for billing and collections. Dr. John Montoni, a chiropractor, worked at the Chelsea Clinic several days each week; he evaluated and treated patients and prescribed treatment, tests, and durable medical goods.

B. EMG tests

One of the diagnostic medical tests performed at the Chelsea clinic was a nerve function study called an electromyogram ("EMG"). An EMG machine looks like a portable computer with wires coming out of it. At the ends of the wires are long needles. A physician performs an EMG test by inserting the needles into a person's muscles until the tips of the needles touch bone. The needles detect electrical signals traveling through the muscle and produce both a visible wave form and a sound on the computer. A typical EMG test involves the testing of five or six muscles in this manner. The test can be extremely painful and is quite memorable.

The EMG machine is capable of printing a report that includes numerical data as well as images of the wave forms produced by the needles. Using a keyboard, it is also possible to enter written information on the report such as the patient's name, date of birth, and the physician's conclusions. The report is normally completed and printed out within minutes of the

test's completion so that the physician who conducted the test can review and sign it.

Unlike some diagnostic tests (such as an X-ray, ultrasound, or MRI), an EMG test cannot be performed by a technician and later read by a physician. The physician must be present when the test is done. One reason is that the test is invasive; it involves sticking long needles into the patient's body. Another reason is that the physician must view the wave forms and sounds produced by the needles in "real time" in order to determine whether the test is normal or abnormal.

C.  Global Tech

When the Chelsea Clinic opened for business, Moyseyev created a separate company called Global Tech to bill for the EMG tests. At the time, automobile insurance companies would reimburse the cost of EMG tests only if they received certain supporting documents. Among those were a doctor's prescription for the test and an EMG report signed by the doctor who conducted the test. Between December 1998, when the Chelsea clinic opened, and in or about December 1999, when it began doing business at a different location, Global Tech's billing was performed by clerical workers who worked at the Chelsea clinic under Moyseyev and Yelaun's supervision. In November 1999, Moyseyev and Yelaun had a falling out and Yelaun ceased working at the Chelsea clinic. From in or about December 1999 until in or about May

2001, Global Tech's billing was done by Symco, a professional billing company that Moyseyev hired to process Global Tech's bills.

    D.    <u>Lynn Diagnostics</u>

Beginning in or about November 1999, Yelaun and another man created a company called Lynn Diagnostics to bill for EMG tests that were performed at certain clinics other than the Chelsea clinic. Moyseyev had nothing to do with Lynn Diagnostics. Like Global Tech in December 1999, Lynn Diagnostics hired Symco to process its bills.

    E.    <u>The Fraudulent EMG billings</u>

During the period 1999-2000, Global Tech and Lynn Diagnostics billed insurance companies for over 100 EMG tests that were never actually performed. (Moyseyev was not aware of the Lynn Diagnostics billings.) Many of those fraudulent bills resulted in payment to Global Tech or Lynn Diagnostics. All of the fraudulent test reports were either signed by Dr. John Montoni or stamped with the signature stamp of Dr. Ranendra Chatterjee. Dr. Montoni, who is cooperating with the government, would testify that he was instructed to sign these EMG reports by Yelaun. He would testify that Yelaun and Moyseyev once even came to his house with a stack of reports from EMG tests that purportedly had been done; he was asked to write after-the-fact prescriptions for these tests to make it appear as if they had

4

been prescribed. He complied, even though he knew that doing so was fraudulent. Dr. Montoni would testify that Yelaun and Moyseyev knew he had not actually performed the EMG tests he was told to sign and that, as a chiropractor, he was not qualified to perform them. He would also testify that he knew the only reason Moyseyev and Yelaun could have wanted him to sign the reports and after-the-fact prescriptions was so that they could bill insurance companies for the tests. (Dr. Montoni himself received no direct financial remuneration from the insurance companies from the fraudulent EMG billings.)

Dr. Ranendra Chatterjee would testify that he did not perform any of the EMG tests that were stamped with his signature stamp. He would testify that when he learned that Global Tech was submitting EMG reports to insurance companies that were stamped with his signature stamp, he called the Chelsea Clinic to complain. He would testify that Yelaun and Moyseyev came to his office and Yelaun admitted to him that his signature stamp had been used without his permission and that the practice would stop. Nevertheless, Moyseyev continued to submit claims to automobile insurance companies that included EMG reports that previously had been stamped with Chatterjee's signature, even though Moyseyev knew that those EMG reports were fraudulent.

Yevgeniya Gorovodsky was hired by Moyseyev and Yelaun to do billing at Global Tech. She would testify that she informed

5

Yelaun that insurance companies were declining some bills for EMG tests because the reports were not signed, and Yelaun said he would take care of it. She would testify that once, after this conversation, she went into Yelaun's office and he handed her a file containing an EMG report; the report was stamped with Dr. Chatterjee's signature stamp and the stamped signature was still wet. Gorovodsky would testify that in late 1999, Dr. Chatterjee called the Chelsea clinic and angrily complained that Moyseyev and Yelaun had obtained one of his signature stamps and was using it without his permission. She would testify that she reported this conversation to Moyseyev, who said he and Yelaun were aware of the problem and would take care of it. The government's evidence would show that shortly after this conversation took place, Global Tech ceased submitting EMG reports stamped with Chatterjee's signature, and Global Tech and Lynn Diagnostics began submitting reports signed by Dr. Montoni instead.

Ms. Gorovodsky would further testify that she observed Yelaun cut patient names and physician signatures off of EMG reports and paste them onto other reports and then photocopy the fabricated reports to conceal the cutting and pasting. She would testify that she told Yelaun that this practice was illegal and he replied that she should mind her own business.

At least fifteen patients would testify that they never received a needle EMG test, even though Global Tech or Lynn

6

Diagnostics billed the patient's insurance company for an EMG test and supported the claim with an EMG report with the patient's name on it (signed by Dr. Montoni or stamped with the Chatterjee stamp).

On May 22, 2001, Yelaun was interviewed by FBI agents about his business dealings with Moyseyev. He told the agents, among other things, that Moyseyev had stolen Dr. Chatterjee's signature stamp and had used it to bill insurance companies for services that were not rendered. Yelaun further stated that any document contained in the records of Chelsea Health Management that was stamped with Dr. Chatterjee's signature stamp was a fraudulent billing. Yelaun said that a frequent example of the stamp's unauthorized use was in connection with neurological testing. Yelaun said he saw Moyseyev use Dr. Chatterjee's signature stamp at least 20-25 times when he was not authorized. (These facts are included as evidence of Yelaun's knowledge of and participation in the fraudulent scheme; Moyseyev disputes them.)

Some of the fraudulent EMG tests that were billed by Lynn Diagnostics were prescribed by Dr. David Tamaren, an internist who worked at clinics run by Yelaun one or two days each week. Dr. Tamaren evaluated patients at those clinics and prescribed treatment, tests, and durable medical goods. Yevgeniya Gorovodsky, the Chelsea clinic office worker who did billing for Global Tech, would testify that at one point she told Yelaun and

Moyseyev that insurance companies would not pay for EMG tests unless the file contained a doctor's prescription for the test. When Dr. Tamaren was interviewed by the FBI about this case, he admitted that Yelaun sometimes asked him to write prescriptions for EMG tests that purportedly had already been done, and he complied, writing "EMG prescribed and done" on a prescription pad and signing it. Tamaren knew that the only reason Yelaun could want these after-the-fact prescriptions was so that he could bill insurance companies for the EMG tests and support the claims with the illegitimate after-the-fact prescriptions.

F.  Money laundering

When Moyseyev created Global Tech, he also opened a bank account in Global Tech's name and hired an accountant to prepare Global Tech's tax returns. All deposits into the Global Tech account were made by Moyseyev, and all checks written on the account were signed by him. Moyseyev controlled Global Tech's books and signed its tax returns.

The government's evidence includes numerous checks issued to Global Tech by insurance companies as payment for fraudulent EMG tests that were billed by Global Tech but never actually performed. Moyseyev deposited these checks into Global Tech's bank account and used some of the proceeds to further the fraudulent scheme. Among other things, Moyseyev used some of the proceeds to pay Symco, the billing agency, for its services,

knowing that Symco was billing for claims based on fraudulent EMG tests.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: _____
WILLIAM D. WEINREB
GREGG D. SHAPIRO
JEREMY M. STERNBERG
Assistant U.S. Attorneys

_____
IGOR MOYSEYEV
Defendant

_____
MURRAY P. REISER, ESQ.
Attorney for Defendant

Date:_____

9